**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| AIRMAR TECHNOLOGY CORPORATION<br><br>PLAINTIFF,<br><br>v.<br><br>LCJ CAPTEURS, INC, a French Corporation; RAINWISE, INC., a Maine Corporation; and FUGAWI, INC., a Canadian Corporation<br><br>DEFENDANTS | CASE NO. __________<br><br>COMPLAINT AND PETITION FOR EQUITABLE RELIEF<br><br>JURY TRIAL REQUESTED |

NOW COMES the Plaintiff, Airmar Technology Corporation, by and through their counsel, Sheehan Phinney Bass & Green, P.A., and state and allege as follows:

## I. PARTIES

1. Plaintiff Airmar Technology Corporation ("Airmar") is a New Hampshire corporation with a principal place of business at 35 Meadowbrook Drive, Milford, New Hampshire, 03055-4316.

2. Defendant LCJ Capteurs, Inc. ("LCJ Capteurs") is a French corporation with a principal place of business at Z.A. le Chêne Ferré, 29 allée des Cinq Continents, 44120 VERTOU – France.

3. Defendant Fugawi Inc. (f/k/a Northport Systems, Inc.)("Fugawi") is a Canadian corporation with a principal place of business at 411 Richmond St. E., Suite 307, Toronto, Ontario, M5A 3S5 Canada.

4. Defendant RainWise, Inc. is a Maine corporation with a principal place of business at 18 River Field Road, Trenton, ME 04605.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between all Plaintiffs and all Defendants. Personal jurisdiction is appropriate as the Plaintiff was organized in and has its principal place of business in the State of New Hampshire, and all corporate Defendants transact business in the State of New Hampshire.

6. Venue in this court is proper pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391 because all Defendants transact business in this judicial district.

## III. BACKGROUND FACTS

7. Plaintiff Airmar, founded in 1981, is the world-recognized leader in marine-sensing technology, holding numerous patents and manufacturing a broad line of depth, speed and temperature marine sensors serving an international market. Airmar's marine sensors are used for a variety of functions from fish-finding to portable surveying of harbors and ocean-bottom profiling. Airmar also manufactures ultrasonic air transducers with broad applications from flow and level measurement and tank level sensing, to distance measurement, proximity sensing, automation control and obstacle avoidance.

8. Defendant LCJ Capteurs, founded in 1999, specializes in the manufacturing of high precision ultrasonic wind sensors.

9. Defendant Fugawi, Inc., founded in 1995, provides GPS applications, digital charts, software and connectivity services and navigational accessories for leading marine company brands and boaters worldwide.

10. Defendant RainWise, Inc., founded in 1974, manufactures professional grade meteorological equipment for consumer, enterprise, and industrial applications. RainWise advertises a selection of "more than 50 rain and temperature gauges, monitors, sensors, and related software" which it manufactures in the United States for clients including the United States GSA and the National Oceanic and Atmospheric Administration.

11. In 2003, Airmar saw a significant market opportunity for a fully-integrated, durable weather prediction instrument that combined multiple sensors into a single, compact unit without any moving parts. Airmar saw commercial application for this product in meteorology, the marine industry, the offshore oil industry, the renewable energy industry, the military, and more.

12. Airmar had the internal capabilities to develop and manufacture much of this product itself, but needed an ultrasonic wind sensor like the one LCJ Capteurs had developed.

13. Accordingly, on May 12, 2003, Airmar and LCJ entered into a Co-Exclusive License Agreement ("Agreement").

14. Pursuant to this Agreement, Airmar licensed LCJ Capteurs' know-how to fully produce, assemble, calibrate, test, troubleshoot, market and sell LCJ Capteurs' "Licensed Apparatus[1]."

15. The scope of the License is defined by the Agreement as follows:

> **2.00 License**
>
> **2.01 ... Licensor hereby grants to Licensee a sole and exclusive license, with right to sublicense, to make use and sell Licensed Apparatus worldwide. This license is worldwide and the Licensor [LCJ Capteurs] shall not grant similar licenses to other parties during the term of this Agreement.**
>
> **2.02 Notwithstanding the grant in subsection 2.01 Licensor [LCJ Capteurs] retains the co-exclusive royalty free right to make, use and sell Licensed Apparatus worldwide excepting North America. However, the Licensor is authorized to sell to distributors located outside North America, and these distributors located outside North America may resell to any other distributor worldwide, including in North America.**

16. With respect to royalty payments, the parties agreed as follows:

> **4.00 Royalties**
>
> **4.01 For the period of this Agreement, Licensee shall pay Licensor a per unit earned royalty on all Licensed Apparatus sold by Licensee on or after the effective data [sic] of this Agreement and on all Licensed Apparatus manufactured by Licensee during the term of this Agreement and sold by Licensee thereafter, in the amount of thirty-eight (E38.00) Euros per unit of Apparatus for the first one-thousand (1,000) units of apparatus sold or disposed of per calendar year. For each one-thousand (1,000) units sold or disposed of thereafter per calendar year, the unit earned royalty shall be reduced by forty percent (40%) provided that in no event shall the per unit earned royalty be less than six (E6.00) Euros per unit.**
>
> ...
>
> **4.05 The royalties specified in subsection 4.01 above shall be payable up to a royalty cap of three hundred eighty thousand Euros (EUR380,000) <u>after which the licenses granted herein shall become fully paid up and irrevocable</u>.**

(emphasis added).

> **4.06 Licensee shall pay Licensor a minimum annual royalty of thirty-eight thousand Euros (EUR 38,000) in the calendar years 2003, 2004 and 2005. Any difference between**

---

[1] The "Licensed Apparatus" is defined by the Agreement as "wind sensors having four ultrasonic air transducers and a signal processor for resolving wind speed and direction from signals produced by the transducers and a digital output protocol for transmitting wind speed and direction data and protected by the patent right."

> **earned royalties for a calendar year hereunder and the specified minimum is to be paid with the accounting report for each calendar fourth quarter.**

17. With respect to the term of the Agreement, the parties agreed as follows:

> **8.00 Termination**
>
> **8.01 Unless previously terminated under the provisions of the Agreement, this Agreement shall extend until July 1, 2008.**
>
> ...
>
> **8.03 No termination of the license and the rights granted under this Agreement, by expiration or otherwise, shall release either party from any obligations theretofore accrued hereunder, nor rescind anything done or any payment made or other consideration given by either party hereunder prior to the time such termination becomes effective.**

(emphasis added).

18. The Agreement also contained two other relevant provisions in the "Miscellaneous" provisions section as follows:

> **9.04 Licensee may adopt a trademark to indicate Licensee as the manufacturer of the Licensed Product [sic][2]. All right, title and interest in such mark shall inure to the benefit of Licensee. Licensee may also private brand label the Licensed Product [sic].**
>
> **If any provision herein is declared invalid by operation of law or otherwise, the entire Agreement shall not be invalid, and the portions of the Agreement which have not been ruled invalid shall continue in full force and effect. Further, in lieu of each such provision which is invalid, a substituted or added provision shall be made part of this Agreement and shall be as similar as possible in economic and business objective as intended by the parties to such invalid provision, but shall be valid, legal and enforceable.**

(emphasis added).

19. Accordingly, Airmar acquired a number of rights pursuant to the Agreement. First, pursuant to Section 2.01, Airmar acquired the rights to (1) make; (2) use; and (3) sell the Licensed Apparatus worldwide.[3]

---

[2] Despite being called out as a defined term, "Licensed Product" is not defined by the Agreement.

[3] Airmar also acquired the right to sublicense, which is not relevant to this dispute.

20. Second, also pursuant to Section 2.01, Airmar acquired these rights on a "sole and exclusive" basis, with LCJ Capteurs reiterating that it would not grant similar "licenses" to other parties during the term of the Agreement.

21. Finally, pursuant to Section 2.02, LCJ Capteurs clarified that because the Agreement was a "Co-Exclusive License Agreement," LCJ Capteurs would retain the co-exclusive right to make, use, and sell the Licensed Apparatus worldwide, but that this co-exclusive right would specifically *not* extend to North America, where Airmar would have the *sole* and exclusive license to make, use, and sell the Licensed Apparatus.

22. To avoid accidental violations of this provision by foreign distributors, however, the parties carved out a narrow exception that if LCJ Capteurs sold the Licensed Apparatus to a distributor outside of North America, but that distributor then re-sold the Licensed Apparatus to a distributor in North America, that such a resale would not violate Airmar's North American exclusivity rights.

23. The parties successfully conducted business pursuant to this Agreement without incident for four years, before opening discussions in early 2007 on an extension to their Agreement.

24. At the conclusion of those discussions, on May 18, 2007, the Parties signed an Amendment to Co-Exclusive License Agreement ("Amended Agreement"). Pursuant to that Amendment, two provisions of the original May 12, 2003 Co-Exclusive License Agreement were changed as follows:

> **1. ROYALTIES**
>
> **Paragraph 4.05 of the Agreement is replaced in its entirety with the following:**
>
> **4.05 The royalties specified in subsection 4.01 above shall be payable up to a royalty cap of three hundred eighty thousand Euros (EUR 380,000) after which the licenses granted herein shall become fully paid up, irrevocable, <u>and perpetual.</u>**

> **2. TERM**
>
> **Paragraph 8.01 of the Agreement is replaced in its entirety with the following:**
>
> **8.01 Unless previously terminated under the provisions of the Agreement, this Agreement shall extend until July 1, 2013.**

(emphasis added).

25. The May 18, 2007 Amendment to Co-Exclusive License Agreement, thus, did precisely two things. First, it made the licenses provided by LCJ Capteurs to Airmar pursuant to the Agreement irrevocable *and* perpetual if Airmar reached the three hundred eighty thousand Euro royalty cap.

26. Second, it extended the term of the original Agreement by five years to July 1, 2013.

27. The parties then continued successfully conducting business pursuant to the Amended Agreement.

28. Airmar reached the three hundred eighty thousand Euro royalty cap upon making a quarterly royalty payment of E20,512.40 to LCJ Capteurs in July 2010.

29. There is no dispute that Airmar fulfilled this contractual condition. In fact, Airmar accidentally continued making royalty payments to LCJ Capteurs for the remainder of 2010, and LCJ Capteurs refunded Airmar's royalty payments that were in excess of the agreed-upon EUR 380,000 royalty cap.

30. Accordingly, pursuant to the language of the Amended Agreement, as of July 2010, *all* licenses provided by LCJ Capteurs to Airmar pursuant to the Co-Exclusive License Agreement became fully paid up, irrevocable *and* perpetual.

31. Those licenses included the *sole and exclusive right* (as against everyone except LCJ Capteurs) to (1) make; (2) use; and (3) sell the Licensed Apparatus worldwide.

32. Those licenses also included Airmar's right to the "sole and exclusive" control of the North American market. Pursuant to that right, no company, including LCJ Capteurs itself, was permitted to make, use or sell the Licensed Apparatus in North America.

33. Getting total exclusivity to the North American market was, for Airmar, a critically important, and specifically bargained-for component of this Agreement.

34. On March 25, 2013, however, LCJ Capteurs' President Christophe Michel sent a letter to Airmar stating that as of July 2, 2013 (the day after the Amended Agreement was to expire), LCJ Capteurs considered itself free to commercialize or distribute its technology worldwide, including in North America.

35. On May 10, 2013, LCJ Capteurs, this time through its legal counsel in France, sent another letter to Airmar reiterating LCJ Capteurs' position that it considered itself free to commercialize or distribute its technology worldwide, without restriction.

36. On July 3, 2013, Airmar's then-counsel David Brody of Hamilton Brook responded, pointing out that the addition of the word "perpetual" to Section 4.05 of the Amendment to Co-Exclusive License Agreement was the "result of negotiations between the parties that specifically inserted that term into the agreement by amendment" and that the "specific stated intent of the two parties [Airmar and LCJ Capteurs]" and the "business objective of the amendment was to give Airmar a 'perpetual' license if Airmar were to pay EUR 380,000 to LCJ Capteurs on or before July 1, 2013."

37. Counsel for LCJ Capteurs responded on September 3, 2013 and continued to dispute Airmar's interpretation of the Co-Exclusive License Agreement and its Amendment. However, counsel's September 3, 2013 letter closed with the reassurance to Airmar that LCJ Capteurs "had no intention" to commercialize or distribute the relevant technology in North America.

38. On September 4, 2013, Airmar's then-counsel David Brody placed the capstone on the discussion, stating that

> "we agree that it appears that nothing is to be gained from further exchanges because of your statement that LCJ Capteurs has no intention of commercializing in America the technology that is covered by the parties' agreement. So long as LCJ Capteurs does not engage in activities that Airmar believes are prohibited by the agreement, it is sufficient for us to "agree to disagree" on the matter. However, please advise your client that if it engages in the activities that Airmar believes are prohibited by the agreement, Airmar will proceed accordingly."

39. There was no further dialogue between the parties on the subject of the Co-Exclusive License Agreement or its Amendment, and Airmar went back to manufacturing, marketing and selling the technology worldwide pursuant to its perpetual license granted by the Agreement.

40. On December 5, 2014, however, Toronto, Canada-based Fugawi Inc., put out a press release announcing "a partnership with LCJ Capteurs to be the exclusive distributor of the company's full range of durable and reliable barometric and ultrasonic wind sensors in Canada and the United States." The press release quotes LCJ Capteurs President Christophe Michel, stating that LCJ Capteurs is "very happy to partner with Fugawi to make our hi-tech marine products, such as the CV7 wind sensors and the award-winning BaroPlug available to North American boaters."

41. These products announced in the Fugawi press release fall within the definition of a "Licensed Apparatus" that is protected by Airmar's perpetual exclusive license to directly manufacture and/or sell these products in the North American market.

42. In fact, a June 10, 2015 article in Waterway Guide explained that "… LCJ Capteurs developed high precision ultrasonic solid-state wind sensors with no moving parts to fit a wide range of needs. The sensors *have been used* in … Airmar weather stations. They are now available in the U.S. and Canada from Fugawi (emphasis added)."

43. A few months later, Maine-based RainWise, Inc. put out a press release announcing that "RainWise, known for the manufacture of precision weather instruments, is pleased to add the top quality LCJ products to their offerings." Effective March 1, 2015, "RainWise now has exclusive rights for the North American distribution of the LCJ land-based ultrasonic wind sensor line, and general distribution rights for the marine-based ultrasonic sensor line."

44. The RainWise press release went on to note that "[i]n addition to acting as North American distributors for the LCJ Capteurs ultrasonic line, RainWise is also working on several new products that incorporate this patented wind sensor technology. The CV7 line of LCJ Capteurs Ultrasonic Wind Sensors and related products can be purchased from the RainWise website www.rainwise.com/ultrasonicwind or through our sales staff at sales@rainwise.com."

45. These products announced in the RainWise press release fall within the definition of a "Licensed Apparatus" that is protected by Airmar's perpetual and exclusive license to directly manufacture and/or sell these products in the North American market.

46. Fugawi negotiated rights with LCJ Capteurs to be the "exclusive distributor of [LCJ Capteurs'] full range of durable and reliable barometric and ultrasonic wind sensors in Canada and the United States," at roughly the same time that RainWise was negotiating its "exclusive rights for the North American distribution of the LCJ land-based ultrasonic wind sensor line, and general distribution rights for the marine-based ultrasonic sensor line." These "exclusive" rights both overlap with *each other*, *and* directly violate *Airmar's* perpetual "sole and exclusive" right to "make, use and sell the Licensed Apparatus" in the North American market.

47. The fact that (1) LCJ Capteurs both negotiated these conflicting exclusive rights agreements with Fugawi and RainWise, while, at the same time, ignoring its existing exclusive

contractual relationship with Airmar; and (2) did so even *after* reassuring Airmar in September 2013 that it "had no intention" to commercialize or distribute the relevant technology in North America is clear evidence of LCJ Capteurs' actionable conduct.

## IV. CAUSES OF ACTION

**COUNT I – PETITION FOR INJUNCTIVE RELIEF (against Defendant LCJ Capteurs)**

48. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

49. A preliminary and permanent injunction is necessary to enjoin LCJ Capteurs from entering into any additional agreements with North American-based manufacturers and/or distributors who will sell the Licensed Apparatus in North America, or build the Licensed Apparatus into their own products for sale in North America in violation of Airmar's sole and exclusive license. No award of monetary damages can accurately capture the value to Airmar of having the sole and exclusive right to the Licensed Apparatus in the North American marketplace. There is no way to completely and accurately measure the intrinsic value of that exclusivity, and all of the related product business that is driven to Airmar because of it, or would flow out of Airmar as a result of losing it. There is also no way to completely and accurately measure Airmar's damages resulting from lost sales that flow to these other distributors. In the case of a product containing LCJ Capteurs' Licensed Apparatus, it may not be possible to tell whether a customer purchased the competing product *because* it contained the Licensed Apparatus, or for some other, unrelated commercial reason. It may also be difficult to accurately discern what portion of such a product's profit is attributable to the Licensed Apparatus.

50. The failure to grant a preliminary and permanent injunction in this case would immediately and irreparably harm Airmar should the Court ultimately find for Airmar on the merits of this case. LCJ Capteurs has been making agreements with new companies to distribute the Licensed Apparatus in North America, either directly, or by building it into their own products in violation of the Amended Agreement with Airmar. If the Court were to deny this request for temporary relief, LCJ Capteurs could continue this unauthorized practice until a final disposition in this case is rendered, which will make it very difficult to discern the financial damage caused to Airmar – because doing so will require a determination whether each customer purchased the competing products knowing of the inclusion of the Licensed Apparatus or for some other, unrelated commercial reason. This will be difficult to determine without interrogating every such customer about the motivation behind his/her/its purchasing decision.

51. Airmar is likely to prevail on the merits because LCJ Capteurs and Airmar specifically negotiated the language of the Amended Agreement to give Airmar the perpetual right to make, use and sell the Licensed Apparatus on a sole and exclusive basis in the North American market. The language of the Amended Agreement is clear and unequivocal in that regard.

52. In addition, once this dispute came to light, LCJ Capteurs assured Airmar that it had "had no intention" to commercialize or distribute the Licensed Apparatus in North America except through Airmar – but then did precisely the opposite. This behavior constitutes the kind of vexatious, wanton, obdurate and obstinate decision making which has forced this action without any reasonable defense in the law, such that LCJ Capteurs' actions constitute bad faith warranting an award of attorney's fees under the New Hampshire Supreme Court's decision in Harkeem v. Adams, 117 N.H. 687, 691 (1977).

**COUNT II – PETITION FOR INJUNCTIVE RELIEF (against Defendant Fugawi, Inc.)**

53. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

54. A preliminary and permanent injunction is necessary to enjoin Fugawi, Inc. from selling the Licensed Apparatus in North America, or building the Licensed Apparatus into their own products for sale in North America. While an award of money damages to Airmar disgorging the profit Fugawi has already derived from direct sales of the standalone Licensed Apparatus may address some of the harm already done, such an award would not address Airmar's lost profits for sales of Fugawi's products *containing* the Licensed Apparatus. It will be very difficult to determine the amount of such lost profits, as doing so will require a determination whether each customer purchased the competing products knowing of the inclusion of the Licensed Apparatus or for some other, unrelated commercial reason. This will require an interrogation of every such customer about the motivation behind his/her/its purchasing decision. It may also be difficult to accurately discern what portion of such a product's profit is attributable to the Licensed Apparatus.

55. Fugawi is also likely to want to protect its customer list, so any such effort is likely to be contested by Fugawi as an invasion of their proprietary and confidential information – making such an effort even more complicated and expensive to carry out.

56. The failure to grant a preliminary and permanent injunction in this case would, for the reasons mentioned above, immediately and irreparably harm Airmar should the Court ultimately find for Airmar on the merits of this case.

57. Airmar is likely to prevail on the merits because LCJ Capteurs and Airmar specifically negotiated the language of the Amended Agreement to give Airmar the perpetual

right to make, use and sell the Licensed Apparatus on a sole and exclusive basis in the North American market. The language of the Amended Agreement is clear and unequivocal in that regard, and Fugawi, Inc. is violating the terms of that Amended Agreement by selling the Licensed Apparatus in the North American marketplace.

**COUNT III – PETITION FOR INJUNCTIVE RELIEF (against Defendant RainWise, Inc.)**

58. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

59. A preliminary and permanent injunction is necessary to enjoin RainWise, Inc. from selling the Licensed Apparatus in North America, or building the Licensed Apparatus into their own products for sale in North America. While an award of money damages to Airmar disgorging the profit RainWise has already derived from direct sales of the standalone Licensed Apparatus may address some of the harm already done, such an award would not address Airmar's lost profits for sales of RainWise products *containing* the Licensed Apparatus. It will be very difficult to determine the amount of such lost profits, as doing so will require a determination whether each customer purchased the competing products knowing of the inclusion of the Licensed Apparatus or for some other, unrelated commercial reason. This will require an interrogation of every such customer about the motivation behind his/her/its purchasing decision. It may also be difficult to accurately discern what portion of such a product's profit is attributable to the Licensed Apparatus.

60. RainWise is also likely to want to protect its customer list, so any such effort is likely to be contested by RainWise as an invasion of their proprietary and confidential information – making such an effort even more complicated and expensive to carry out.

61. The failure to grant a preliminary and permanent injunction in this case would, for the reasons mentioned above, immediately and irreparably harm Airmar should the Court ultimately find for Airmar on the merits of this case.

62. Airmar is likely to prevail on the merits because LCJ Capteurs and Airmar specifically negotiated the language of the Amended Agreement to give Airmar the perpetual right to make, use and sell the Licensed Apparatus on a sole and exclusive basis in the North American market. The language of the Amended Agreement is clear and unequivocal in that regard, and Fugawi, Inc. is violating the terms of that Amended Agreement by selling the Licensed Apparatus in the North American marketplace.

**COUNT IV – BREACH OF CONTRACT (v. LCJ Capteurs)**

63. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

64. LCJ Capteurs entered into a valid Co-Exclusive License Agreement with Airmar on May 12, 2003.

65. That Agreement was validly amended on May 18, 2007 by the parties' Amendment to Co-Exclusive License Agreement.

66. Pursuant to that Agreement and Amendment, the licenses provided by LCJ Capteurs to Airmar in that Agreement were to become irrevocable *and* perpetual if Airmar paid LCJ Capteurs at least three hundred eighty thousand Euros in royalties prior to July 1, 2013.

67. Airmar reached the three hundred eighty thousand Euro royalty cap upon making a quarterly royalty payment to LCJ Capteurs of E20,512.40 in July 2010.

68. Accordingly, as of July 2010, Airmar's licenses granted under the Amended Agreement became both irrevocable and perpetual.

69. Those irrevocable and perpetual rights included the rights to (1) make; (2) use; and (3) sell the Licensed Apparatus worldwide; *and* to have the "sole and exclusive" rights, as against any other party (including LCJ Capteurs itself), to the North American market.

70. LCJ Capteurs breached the Amended Agreement by granting distribution rights for the Licensed Apparatus to both Fugawi and/or RainWise.

71. Airmar has been damaged by LCJ Capteurs' breach of contract in an amount to be proven at trial.

**COUNT V – Intentional Misrepresentation (v. LCJ Capteurs)**

72. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

73. Defendant LCJ Capteurs made false representations of material facts within the Defendant's knowledge as specifically alleged in Paragraphs 1-42 above.

74. Defendant LCJ Capteurs made these false representations to Airmar with knowledge of their falsity or with knowledge that they would be misleading to Airmar.

75. Defendant LCJ Capteurs made these false and/or misleading representations to Airmar with the intention to induce Airmar to act in reliance thereon.

76. Defendant LCJ Capteurs' misrepresentations, in fact, caused Airmar to act in reasonable reliance thereon.

77. Defendant LCJ Capteurs' conduct constituted a willful and wanton disregard for Airmar's rights under its Amended Agreement with LCJ Capteurs, and Airmar suffered direct

and specific pecuniary damages as a result of its reliance upon LCJ Capteurs' misrepresentations in an amount to be shown at trial.

**COUNT VI – Fraudulent Nondisclosure (v. LCJ Capteurs)**

78. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

79. Defendant LCJ Capteurs concealed from Airmar facts material to the transactions and agreements at issue in this case.

80. The facts concealed from Airmar were within the Defendant's knowledge.

81. Defendant LCJ Capteurs had a legal or equitable duty to communicate these facts to Airmar, and knew that Airmar would act on the presumption that no such facts existed.

82. Defendant LCJ Capteurs' conduct constituted a willful and wanton disregard for Airmar's rights under the Amended Agreement.

83. Airmar suffered direct and specific pecuniary damages as a result of Defendant LCJ Capteurs' fraudulent nondisclosure in an amount to be shown at trial.

**COUNT VII – Negligent Misrepresentation/Nondisclosure (v. LCJ Capteurs)**

84. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

85. Defendant LCJ Capteurs, in the course of its business, supplied false information to and/or withheld materially significant information from Airmar.

86. Defendant LCJ Capteurs failed to exercise reasonable care in confirming the accuracy of the information supplied to Airmar and in withholding materially significant information from Airmar.

87. Airmar justifiably relied on the information communicated to it by LCJ Capteurs.

88. Airmar suffered direct and specific pecuniary damages as a result of its reliance on LCJ Capteurs' misrepresentations and/or nondisclosures in an amount to be shown at trial.

**COUNT VIII – Violation of the Unfair Trade Practices/Consumer Protection Act NH RSA 358-A (v. LCJ Capteurs)**

89. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

90. The Defendant is a "person" as defined by the Act.

91. The Defendant LCJ Capteurs engaged in an unfair method of competition and/or an unfair or deceptive act or practice in its business relations with Airmar.

92. The Defendant's actions giving rise to this complaint occurred "in commerce" as defined by the Act.

93. Airmar has been specifically damaged by the Defendant's unfair methods of competition and/or an unfair or deceptive acts or practices in an amount to be shown at trial.

94. In addition, because the Defendant's unfair methods of competition and/or an unfair or deceptive acts or practices were willful, Airmar should be awarded treble damages against the Defendant, LCJ Capteurs.

95. Airmar also seeks an award of its reasonable attorney's fees and costs pursuant to RSA 358-A:10, in connection with bringing this lawsuit.

## V. REQUEST FOR RELIEF

WHEREFORE, Plaintiff Airmar requests the following relief from the Court:

### Temporary Relief

1. On Counts I-III, entry of a preliminary injunction enjoining LCJ Capteurs, Fugawi and RainWise, respectively, and their agents, representatives and others acting on their behalf, from violating Airmar's sole and exclusive perpetual right to make, use and sell the Licensed Apparatus in the North American market.

2. Award attorney's fees against Defendant LCJ Capteurs as the Defendant responsible for the vexatious behavior that necessitated Airmar's request for a preliminary injunction; and

3. For such other temporary relief as the Court may deem just and equitable.

### Permanent Relief

4. On Counts I-III, entry of a permanent injunction enjoining LCJ Capteurs, Fugawi and RainWise, respectively, and their agents, representatives and others acting on their behalf from violating Airmar's sole and exclusive perpetual right to make, use and sell the Licensed Apparatus in the North American market.

5. Award attorney's fees against Defendant LCJ Capteurs as the Defendant responsible for the vexatious behavior that necessitated this lawsuit; and

6. For such other permanent equitable relief as the Court may deem just and equitable.

7. On Count IV, damages in an amount to be proven at trial.

8. On Count V, damages in an amount to be proven at trial.

9. On Count VI, damages in an amount to be proven at trial.

10. On Count VII, damages in an amount to be proven at trial.

11. On Count VIII, damages in an amount to be proven at trial, multiplication of those damages pursuant to RSA 358-A:10 due to Defendant LCJ Capteurs' willful and knowing unfair trade practices, and an award of Airmar's reasonable attorney's fees and costs in bringing this case pursuant to RSA 358-A:10.

12. For such other relief as the Court may deem just and equitable.

Dated: November 6, 2015

**SHEEHAN, PHINNEY, BASS & GREEN P.A.**

By: /e/ Robert H. Miller

Robert H. Miller (NH #13881)
1000 Elm Street 17th Floor
P.O. Box 3701
Manchester, NH 03105-3701
Telephone: 603-627-8145
Facsimile: 603-641-2380

**ATTORNEY FOR PLAINTIFFS**